UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

DAVID K.[1],                        )
                                    )
      Plaintiff,              )
                                    )
v.                                  )    CIVIL NO. 1:20cv391
                                    )
KILOLO KIJAKAZI, Acting             )
Commissioner of Social Security,    )
                                    )
      Defendant.              )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) under Title II of the Social Security Act. 42 U.S.C. § 423(a), and

Supplemental Security Income (SSI) under Title XVI of the Act. 42 U.S.C § 1383(c). Section

205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based. The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

mental impairment which can be expected to last for a continuous period of no less than 12

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

is "an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It

must be shown that the impairment is severe enough to preclude the plaintiff from engaging in

substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372

U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that

the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds

v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record

as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v.

Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786

(7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*,

552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed,

42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also

Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

2

1.      The claimant meets the insured status requirements of the Social Security Act
        through December 31, 2018.

2.      The claimant has not engaged in substantial gainful activity since March 15, 2017,
        the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.      The claimant has the following severe impairments: status-post fracture of the
        right lower extremity; degenerative disc disease of the cervical spine;
        asymptomatic HIV; obesity; and anxiety disorder (20 CFR 404.1520(c) and
        416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that
        meets or medically equals the severity of one of the listed impairments in 20 CFR
        Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
        416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the
        claimant has the residual functional capacity to perform light work as defined in
        20 CFR 404.1567(b) and 416.967(b) except subject to the following additional
        limitations: The claimant is able to occasionally climb stairs or ramps, balance,
        and stoop. He should never kneel, crouch, crawl or climb ladders, ropes or
        scaffolds. He must avoid concentrated exposure to dangerous or uneven terrain,
        moving machinery and unprotected heights. He is able to work with an option to
        sit or stand, changing positions no more frequently than every 30 minutes, while
        remaining on task. He is able to perform work that can be learned in 30 days, or
        less, with simple routine tasks. He is able to remain on task in two-hour
        increments.

6.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on August 12, 1967 and was 49 years old, which is defined
        as a younger individual age 45-49, on the alleged disability onset date. The
        claimant subsequently changed age category to closely approaching advanced age
        (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20
        CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past
        relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-29).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed his opening brief on September 7, 2021.  On November 16, 2021 the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on November 30, 2021.  Upon full review of the record in this cause, this Court is of the view that the Commissioner's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"? (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Infectious diseases specialist nurse practitioner Andrew Barchus first saw Plaintiff on March 29, 2016 for follow-up of his HIV positive status following a move to the area in the previous year. (Tr. 447). NP Barchus noted that Plaintiff was originally diagnosed in 2004 and had only two short periods of medication non-compliance ranging over a few months. Plaintiff said he had "no real" symptoms "except for chronic fatigue." *Id*. NP Barchus saw Plaintiff again in July and November of 2016; February and July of 2017; January, May, and June of 2018; and February, May, and October of 2019. (Tr. 465, 479, 527, 540, 633, 659, 679, 1003, 1018-19). Plaintiff reported having loose stools in November 2016, which had resolved by February 2017. (Tr. 527). At the January 2018 visit, Plaintiff disclosed that he used meth about 5 months prior but had stopped and retained sobriety since then. (Tr. 634). He also complained of abdominal, right knee, and right shoulder pain. *Id*. By May 2018, he reported some improvement with his abdominal pain. (Tr. 660). In June 2018, he acknowledged drinking alcohol "on a somewhat regular basis" and said that he was not able to work primarily due to back issues. (Tr. 680).

NP Barchus provided an undated letter regarding Plaintiff that was submitted on August 5, 2019. (Tr. 934-35). He noted that Plaintiff "was diagnosed with HIV/AIDS in 2004 and carries a formal diagnosis of AIDS which means his immune system has suffered significant distortion. He has had persistent severe fatigue since his diagnosis along with intermittent nausea and emesis; he also has reported to me on several occasions diarrhea, which can be a side effect of his HAART." (Tr. 935). NP Barchus also replied to a physical residual RFC questionnaire on July 11, 2019. (Tr.

5

937-41). In this questionnaire, he again noted "at times significant fatigue" but also stressed that Plaintiff had musculoskeletal diagnoses unrelated to his HIV/AIDS that would best be addressed by his orthopedist's records. (Tr. 937). He believed that Plaintiff would be capable of only low-stress jobs due to his chronic severe fatigue and chronic gastrointestinal issues, and he also believed that Plaintiff would frequently experience pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 938).

Plaintiff established care with family medicine physician Jason Row, M.D. on May 26, 2017, complaining of cough and insomnia and seeking smoking cessation at that time. (Tr. 689). Plaintiff returned to Dr. Row on August 25, 2017, complaining of fatigue and low libido. (Tr. 697). Plaintiff went to the Parkview ER on January 7, 2018 for abdominal pain, nausea, and diarrhea. (Tr. 555). He had a positive Murphy's sign on exam, but a gallbladder ultrasound was unremarkable. (Tr. 558-59). He was discharged with a differential diagnosis of mild biliary colic versus gastritis. (Tr. 559). Plaintiff returned to Dr. Row on January 19, 2018 for a follow up from the ER visit. (Tr. 701). Once more, a positive Murphy's sign was noted. (Tr. 703). Plaintiff then saw nurse practitioner Chelsea Bodinka on February 1, 2018 for "stiff neck" and flu-like symptoms. (Tr. 712-713). He saw family medicine physician Christopher Conrad, M.D. for the same symptoms on the following day, after negative flu testing and a lack of improvement with Tessalon Perles, Delsym, or Mucinex DM. (Tr. 715). Dr. Conrad prescribed an albuterol inhaler, doxycycline, and prednisone. *Id*. When Plaintiff saw Dr. Row again on March 2, 2018, his cough had finally resolved, but he said that chest wall discomfort persisted and was not helped by ibuprofen and Aleve, although Norco helped "considerably."  (Tr. 720). Dr. Row assessed

6

thoracic myofascial strain, prescribing Flexeril and an additional twelve tablets of Norco, as he suspected that the pain "should be wrapping up in the next several days." (Tr. 721-22).

Plaintiff returned to Dr. Row on July 30, 2018, complaining of ongoing back pain that woke him at night; he said he had to cut down on his work hours due to this back pain, as well as pain in his feet and left sacroiliac area. (Tr. 723). He also complained of numbness throughout his left hand and fingers with right little finger numbness. *Id*. On examination, he had limited left rotation of the spine, painful cervical spine extension and leftward rotation, tenderness in the left thoracic paraspinal muscles and in the trapezius, and symmetrically depressed reflexes at the biceps and brachioradialis bilaterally but normal sensation in the fingers. (Tr. 724). Dr. Row suggested physical therapy. (Tr. 725).

Plaintiff presented to Dr. Stephanie Ruales for evaluation of severe neck pain on August 7, 2018; range of motion was decreased, there was thoracic and cervical spine tenderness, and cervical spine x-rays demonstrated straightening of the normal lordotic curvature and only very mild degenerative changes. (Tr. 797, 799). Dr. Ruales encouraged continuing with muscle relaxants and NSAIDs and participating in the scheduled physical therapy, although she did provide a prescription for Norco. (Tr. 800).

Plaintiff presented for physical therapy evaluation on August 10, 2018, where he was noted to exhibit "cervical and thoracic pain consistent with radiographic findings of facet degeneration as well as significant myofascial restrictions that are painful and limit functional mobility." (Tr. 731). After going to the physical therapy evaluation, Plaintiff experienced worsened pain and went to the ER that same day because he said his doctor's office could not provide any more pain medicine prescriptions. (Tr. 810). Because Plaintiff had just been provided

a Norco prescription three days earlier and because this was a chronic pain situation, the ER physician did not feel comfortable prescribing anymore narcotic pain medications, and Plaintiff became "very upset." (Tr. 813). Cervical spine MRI on August 16, 2018 demonstrated mild to moderate cervical spondylosis with spinal and foraminal stenoses at multiple levels, as well as a likely cyst. (Tr. 784-85).

While participating in physical therapy, Plaintiff also presented to pain management physician Gianna Casini on August 28, 2018. (Tr. 781). On examination, Dr. Casini noted that Plaintiff's cervical paraspinous muscles and bilateral trapezius muscles were exquisitely tender, and there was pain with all range of motion. (Tr. 787). Dr. Casini provided a list of alternative sleep aids as Plaintiff could not take narcotics while on Ambien; she also discontinued gabapentin due to drowsiness and started Lyrica. (Tr. 788). She additionally ordered a TENS unit. *Id*.

Psychologist Leslie Predina conducted a consultative mental status examination of Plaintiff on September 6, 2018. (Tr. 791). Dr. Predina noted that Plaintiff was cooperative and appeared to put forth good effort, his affect was flat, and his ability to sustain concentration and persistence appeared impaired. (Tr. 792). Mental status exam performance also indicated some issues with his level of cognitive functioning, his judgment and common sense appeared to be slightly impaired, and he also appeared to be experiencing minor problems with his memory. (Tr. 794). Dr. Predina opined that Plaintiff "appears to have the cognitive ability to perform comparable jobs to that which he has performed in the past," although his "ability to sustain his concentration and persistence appeared to be impaired. He would likely have some problems being able to concentrate and persist on his job responsibilities." (Tr. 794). Dr. Predina diagnosed non-REM sleep arousal disorder of the sleepwalking type with sleep-related eating

8

and social anxiety disorder. *Id*.

Plaintiff went back to Dr. Row on October 29, 2018 for rhinorrhea and right thumbnail swelling and pain. (Tr. 806). Dr. Row assessed a viral upper respiratory tract infection and paronychia of the right thumb. (Tr. 807).

Plaintiff fell off a ladder and went to the Parkview ER on November 7, 2018 due to resultant right ankle pain. (Tr. 826). X-rays revealed a fracture of the ankle. (Tr. 829-30). He was placed in a boot and crutches and was instructed to be non-weightbearing until surgery could be performed the following day. (Tr. 830). Surgeon David Goertzen performed an open reduction and internal fixation of the right ankle trimalleolar fracture on the next day as planned. (Tr. 849-50). Plaintiff was instructed to remain non-weightbearing on his right lower extremity. (Tr. 882). Plaintiff followed up from the procedure on December 26, 2018 with nurse practitioner Ruth Poppele. (Tr. 907). He reported a dull, intermittent pain and stated that his condition had improved. He was using assistive devices to help with his gait. NP Poppele instructed Plaintiff to be weightbearing as tolerated in his boot, gradually increasing the weightbearing and weaning from his fixed ankle walker to a shoe. *Id*. Plaintiff continued to report pain and continued to use assistive devices at visits in January and March of 2019, and weightbearing as tolerated was continually recommended. (Tr. 919, 925).

Dr. Row saw Plaintiff on April 8, 2019, at which time Plaintiff complained of muscle cramping in the calf and thigh and significant atrophy. (Tr. 914). Dr. Row noted, "He is just starting to use the leg again and is now nearly full weight-bearing with 1 crutch." *Id*. Plaintiff also reported neuropathic symptoms in his left hand, and Dr. Row believed that this would resolve with time as Plaintiff got off the crutch. (Tr. 914, 916). Dr. Row increased Plaintiff's

9

gabapentin to address the pain and paresthesias. (Tr. 916). Plaintiff went back to NP Poppele for postoperative follow-up the next day, and he complained of pain and swelling. (Tr. 921). He was still using assistive devices and was still instructed to be weight-bearing as tolerated. (Tr. 922).

At a visit on June 21, 2019, Dr. Row noted that Plaintiff was still walking with a crutch; Plaintiff said that his "orthopedic surgeon told him the fracture line wasn't completely filled in." (Tr. 931). Dr. Row observed slight swelling about the right ankle. (Tr. 932). Dr. Row also noted that there "seems to be a gap between [what the] orthopedic surgeon told him and what his office nurse told us about whether his fracture is healed and whether he should have ongoing pain. He will sort that out with them and ask that they send us a report." (Tr. 933). Dr. Goertzen, the surgeon, saw Plaintiff on June 26, 2019. (Tr. 999). Dr. Goertzen noted that x-rays showed that the fracture was healing well; he demonstrated some stretching exercises and discussed the possibility of removing the hardware in the ankle in the future if he continued to experience pain. (Tr. 1000).

Physical therapist Jason Winegardner conducted a functional capacity evaluation (FCE) of Plaintiff on September 5th and 11th of 2019. (Tr. 943). Mr. Winegardner noted, "Plaintiff reports after first day of testing his pain levels were unusually higher than normal notably at the left knee and right ankle." (Tr. 945). Testing showed decreased range of motion in the cervical spine, shoulders, wrists, hips, left knee, and ankles. (Tr. 945-46). He also had reduced strength in his cervical spine, abdomen, and upper and lower extremities. (Tr. 946-47). He had significant decrease in his grip strength bilaterally. (Tr. 947). Mr. Winegardner observed signs of physical discomfort during testing, including facial wince, sighing, shaking out the hands between reps, and holding and massaging the hands. Plaintiff had significantly decreased single leg stances. He

10

ambulated without an assistive device, and his gait was bilaterally antalgic. *Id*. He exhibited signs of competitive test performance, including quick correction following error and voiced exasperation with error. (Tr. 949). He had moderate difficulty with handling and dexterity of test pieces during some of the tests. *Id*. Mr. Winegardner concluded, "Overall test findings, in combination with clinical observations, suggest the presence of full physical effort on [Plantiff's] behalf" and also identified his "subjective reports of pain and disability to be both reasonable and reliable. The presence of pain and/or fatigue were not in contradiction with observed and measured evidence. Repetitive testing and movements remained without inconsistencies." (Tr. 952). Mr. Winegardner opined, based on the test results, that Plaintiff could rarely stand and could rarely walk while being limited to short distances, could occasionally reach forward, could occasionally grasp lightly and never grasp firmly, could occasionally handle and finger, and could rarely lift no more than five pounds safely from waist to shoulder with no other lifting, among other limitations. These limitations were provided with the additional definition of "rare" as up to 5% of the day and "occasional" as up to one-third of the day. *Id*.

Plaintiff followed up with Dr. Row on October 8, 2019. (Tr. 1035). Dr. Row then provided responses to a physical RFC questionnaire on October 22, 2019. (Tr. 986-90). He noted that there was no sign of malingering present on the FCE. (Tr. 987). He believed that Plaintiff would constantly experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id*. He stated that Plaintiff could sit up to about four hours and stand or walk less than two hours in an eight-hour workday. (Tr. 988). He also believed that Plaintiff would need frequent unscheduled breaks throughout the day, lasting ten to fifteen minutes at a time. He limited Plaintiff to rarely lifting and carrying less than 10

pounds and never lifting and carrying 10 pounds or more. *Id*. He indicated further limitations, including handling or fingering only a third of the time bilaterally and reaching overhead only ten percent of the time bilaterally. (Tr. 989). Finally, he estimated that Plaintiff would be absent from work more than four days per month as a result of his impairments and treatment. *Id*.

In the meantime, Plaintiff saw podiatrist Michael McManus on October 1, 2019 to address his ongoing right ankle pain. (Tr. 992). Dr. McManus assessed right posterior tibial tendonitis and encouraged supportive shoe wear. (Tr. 995).

In support of remand, Plaintiff argues that the ALJ erred in her evaluation of the medical opinions. Specifically, Plaintiff asserts that the ALJ committed reversible error by failing to provide a sufficient explanation as to why she favored the opinions of the non-examining state agency consultants over the opinions of the consultative examining psychologist, the examining physical therapist, and Plaintiff's treating providers.

The ALJ found the assessment of the non-examining physician, Dr. Brill, to be "partially persuasive," but recognized greater limitations because Plaintiff had fractured his right ankle since that September 2018 evaluation. (Tr. 27, 84-85). The ALJ found the opinion of the physician on reconsideration, Dr. Eskonen,  to be "more persuasive" because this non-examining consultant "determined the claimant was capable of performing light exertion work with postural restrictions identical to those of the [initial consultant's assessment], but finding additional environmental restrictions consistent with the claimant's ankle fracture and inability to walk on dangerous terrain." (Tr. 27). The second physician completed his assessment in January 2019, noting that Plaintiff's gait was "expected to continue to improve and fracture is healing well. (Tr. 116). The ALJ offered an additional limitation with "the option to alternate sitting and standing in

12

consideration of the claimant's continuing complaints of right ankle pain." (Tr. 27).

Plaintiff notes that the ALJ clearly acknowledged additional impairment resulting in additional limitation beyond that acknowledged by the non-examining physicians in light of her limitation to provide for a sit/stand option. Plaintiff contends that there is new evidence in the record that could evidence that his ankle problem is worsening. Dr. Row, Plaintiff's primary care physician, noted calf muscle atrophy in April 2019 (Tr. 915), apparently a result of Plaintiff's remaining non-weightbearing for so long. Dr. Row also noted slight swelling about the right ankle in June 2019, showcasing continued objective findings of lower extremity impairment. (Tr. 932). The non-examining consultants did not have the benefit of the objective testing and resultant findings collected over two days of examination in the FCE performed by PT Winegardner in September 2019. (Tr. 943-52). Plaintiff argues that objective findings suggest a continuation of ankle issues beyond those anticipated by the reconsideration consultant, who expected gradual improvement.

In response, the Commissioner points out that the ALJ acknowledged that, unlike Dr. Eskonen, Dr. Brill could not have considered Plaintiff's ankle injury, and the ALJ discounted Dr. Brill's assessment accordingly. (Tr. 27). The Commissioner argues that the existence of subsequent evidence does not necessarily render an opinion stale and therefore unreliable. *See Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017) ("If an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end.") (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)). Rather, an opinion will be found stale if the plaintiff can show that the subsequent evidence shows new impairments, or significant worsening of existing impairments, that reasonably could have changed the opinion. *See Moreno*

13

*v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."); *Key*s, 679 F. App'x at 481 ("It is true that Drs. Brill and Sands did not review these later reports, but Keys has not provided any evidence that the reports would have changed the doctors' opinions.").

The Commissioner argues that Plaintiff's ankle injury does not call the assessments of Drs. Brill or Eskonen into question. The Commissioner stresses that unless expected to result in death, a disabling impairment must last or be expected to last at least 12 consecutive months. *Barnhart v. Walton*, 535 U.S. 212, 214-15, 218-19 (2002); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Thus, unless significant limitations of Plaintiff's ankle injury persisted through at least November 2019, the opinions are not stale. The record shows that Plaintiff fractured his ankle on November 7, 2018, and he underwent an open-reduction internal fixation surgery on November 8, 2018. (Tr. 826, 849-50). Subsequent x-rays showed good positioning of the hardware and appropriate healing. (*See, e.g.*, Tr. 907, 919, 922). Although Plaintiff was initially confined to two crutches, by April 6, 2019, he was nearly fully weightbearing on one crutch. (Tr. 914). At the June 26, 2019 orthopedist visit, Plaintiff reported a pain level of 2 to 3, stating that he experienced significant improvement. (Tr. 999). Plaintiff's ankle was unremarkable except for minimal swelling and minimal tenderness, and there was no indication that he was using an assistive device. (*See* Tr. 1000). However, the orthopedist discussed possible hardware removal due to Plaintiff's complaints of pain inside his ankle. (Tr. 1000). When Plaintiff saw a podiatrist on October 1, 2019, to request a boot or shoe to lessen pain with ambulation (*see* Tr. 996), he complained of pain at a level of 1, with activity, and he was not on narcotic pain medication. (Tr.

14

992). He denied having weakness, poor balance, or decreased motion. (Tr. 992). Although the ankle was tender, slightly swollen, and exhibited severely limited inversion and slight loss of strength on inversion, the ankle was otherwise unremarkable. (Tr. 993-94). There was also no indication that Plaintiff was using any assistive devices. (*See* Tr. 992-95). The podiatrist told Plaintiff to make sure to wear supportive shoes and gave him a prescription for physical therapy. (Tr. 995). Also, Plaintiff apparently did not use any assistive devices at the October 2019 visits with Dr. Row or with NP Barchus. (*See* Tr. 1035-38, 1040-47). Dr. Row opined on October 22, 2019, that Plaintiff would not need any assistive device for ambulation. (Tr. 988). Thus, the record shows that Plaintiff recovered from his surgery within 12 months and, while he had residual pain, such pain was reportedly low, and he did not appear to require continuing use of assistive devices for ambulation. Plaintiff's residual ankle symptoms do not appear to significantly affect his ability to perform standing, walking, and other activities consistent with the assessments of Dr. Brill and Dr. Eskonen.

Plaintiff cites an April 2019 finding by Dr. Row of calf muscle atrophy due to a long period of being non-weightbearing. (Tr. 915). However, this finding was not repeated in Dr. Row's later examinations (*see* Tr. 932, 1036), and the doctor did not appear to be overly concerned about Plaintiff's muscle weakness (*see* Tr. 931, 933, 1035, 1038). Moreover, the orthopedist did not note any calf muscle weakness during the June 2019 examination (*see* Tr. 1000), and, similarly, neither did the podiatrist in October 2019, who found normal motor strength in the right foot and ankle, except with inversion (*see* Tr. 993-94). Plaintiff cites Dr. Row's June 2019 finding of slight ankle swelling, but Plaintiff does not explain why this extremely mild abnormality would refute the state agency medical consultants' assessments.

15

Plaintiff cites to PT Winegardner's FCE from September 2019 but does not explain how this examination contradicted the assessments. Accordingly, substantial evidence supports the ALJ's evaluation of the assessments of Dr. Brill and Dr. Eskonen.

Plaintiff also objects to the ALJ's analysis of two examining source opinions. The first opinion was considered by the non-examining consultants. This was the opinion of the psychological consultative examiner, Leslie Predina, from September 2018. (Tr. 791). Dr. Predina interpreted the mental status exam findings to indicate that Plaintiff "appears to have the cognitive ability to perform comparable jobs to that which he has performed in the past," although his "ability to sustain his concentration and persistence appeared to be impaired. He would likely have some problems being able to concentrate and persist on his job responsibilities." (Tr. 794). The nonexamining consultants thus found moderate limitations to maintaining attention and concentration for extended periods and wrote, "The evidence suggests that claimant can understand, remember, and carry out detailed, but not complex tasks. The claimant can relate on a superficial and ongoing basis with co-workers and supervisors. The claimant can attend to tasks for a sufficient period to complete tasks. The claimant can manage the stresses involved with detailed work-related tasks." (Tr. 85-87, 118). The ALJ discussed these psychological opinions in her step three analysis, finding Dr. Predina's opinion to be "mostly persuasive." (Tr. 20). However, the ALJ also found the limitation to concentration to be "rather vague", yet assessed "a restriction for remaining on task in two-hour increments...". *Id*.  The ALJ also rejected a limit to "superficial" interactions found by the nonexamining consultants in part because she determined that it was vocationally undefined. *Id*.

The Commissioner acknowledges that the ALJ found Dr. Predina's assessment to be

"mostly persuasive." (Tr. 21). The ALJ acknowledged that Dr. Predina gave supportive comments and provided the only complete mental health examination in the record, which was thorough. (Tr. 20-21, 794); 20 C.F.R. § 404.1520c(c)(1). The ALJ found that Dr. Predina's findings and specific opinions were mostly consistent with the record. (Tr. 20-21); 20 C.F.R. § 404.1520c (c)(2). The ALJ indicated specifically that Dr. Predina's assessments regarding cognitive ability were persuasive. (Tr. 20). As noted, to account for the assessment that Plaintiff would likely have some problems with concentration and persistence, the ALJ added an RFC restriction to two-hour periods of remaining on task. (Tr. 20). The ALJ found the assessment regarding social functioning to be internally inconsistent given the diagnosis of social anxiety disorder, but nevertheless she agreed that Plaintiff would likely get along with supervisors and coworkers. (Tr. 20). The ALJ finally noted Dr. Predina's specialization and program knowledge. (Tr. 20); 20 C.F.R. § 404.1520c(c)(4), (5).

The Commissioner argues that the ALJ properly considered the regulatory factors, articulating her findings with respect to supportability and consistency. The Commissioner notes that, contrary to Plaintiff's assertion, the ALJ did not compare this opinion to the state agency psychological consultants' assessments (or even refer to such assessments) at all in her evaluation of Dr. Predina's opinion. (Tr. 20-21).

Plaintiff argues that the ALJ should have re-contacted Dr. Predina if she felt that the doctor's opinion was vague. However the duty to re-contact only applies where the evidence is insufficient to reach a decision. *Skarbek*, 390 F.3d at 504; *see* 20 C.F.R. § 404.1520b(b). Plaintiff's citation to *Barnett v. Barnhart* is inapposite because that case was decided prior to the enactment of 20 C.F.R. § 404.1520b (effective Mar. 27, 2017), which clarified that re-contacting

a medical source is not mandatory. Accordingly, substantial evidence supports the ALJ's analysis of Dr. Predina's opinion.

The second examining source opinion was the FCE provided by physical therapist Jason Winegardner over two days in September 2019. (Tr. 943). Plaintiff contends that the ALJ's analysis of this opinion is flawed because she stated that a physical therapist is "not an acceptable source" when crafting an FCE. (Tr. 25). Plaintiff also object that the ALJ stated that a physical therapist was a "non-medical source".

In evaluating PT Winegardner's assessment, the ALJ noted that PT Winegardner gave supportive comments but stated that they appeared to be based largely on Plaintiff's subjective complaints, which the ALJ found not to be particularly credible. *See* Tr. 26; 20 C.F.R. § 404.1520c (c)(1). For instance, the ALJ noted that Plaintiff incorrectly told PT Winegardner that he was only "allowed" to wean off two crutches in August 2019 (Tr. 25, 944); by contrast, the record showed use of one crutch as of April 2019 (Tr. 914). The ALJ also found that the overall medical evidence was not consistent with the FCE findings and assessment, noting the lack of upper extremity abnormalities in treatment notes (Tr. 787, 915, 1000) and the well-healed ankle injury (Tr. 1000). Tr. 26; *see* 20 C.F.R. § 404.1520c(c)(2). The ALJ also considered that the opinion was based on two visits, that PT Winegardner was a specialist, and that the provider did not have knowledge of the Social Security disability program. Tr. 26; 20 C.F.R. § 404.1520c(c)(3) – (5).

Plaintiff has not demonstrated that the evidence of record required the ALJ to find this opinion any more persuasive. With respect to Plaintiff's argument that the ALJ improperly found PT Winegardner not to be an acceptable medical source or a medical source at all, the

18

Commissioner points out that the ALJ only relied on these assertions to conclude that she was not obligated to evaluate the persuasiveness of PT Winegardner's opinion under the regulations. (Tr. 25). Any error in this reasoning would be harmless because the ALJ in fact evaluated the persuasiveness of the opinion. (Tr. 25-26); *Karr*, 989 F.3d at 513.

In any event, even if the ALJ misinterpreted PT Winegardner's statements regarding Plaintiff's pain reports and their consistency with the objective findings, this would be harmless. The ALJ noted when discussing the FCE report that the provider found that Plaintiff's pain ratings on the second day of testing did not contradict the objective test findings, despite being "unusually higher than normal," especially in the left knee, with no documented impairment. (Tr. 25). This purported inconsistency is relevant to the supportability factor because it is probative of the quality of PT Winegardner's explanation for his findings. *See* 20 C.F.R. § 404.1520c(c)(1). However, when discussing supportability, the ALJ focused on the provider's degree of reliance on subjective complaints. Tr. 26; *see Shickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at *11 (N.D. Ill. Dec. 10, 2015) (noting that issue of reliance on subjective complaints relevant to supportability factor); *see also Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (stating that opinions may be discounted for relying on subjective complaints that are not credible). It therefore appears that this purported internal inconsistency did not significantly affect the ALJ's weighing of the appropriate factors, and Plaintiff has not shown otherwise.

Plaintiff's other objections relate to the ALJ's treatment of secondary factors, which the ALJ did not even have to discuss. 20 C.F.R. § 404.1520c(b)(2). The ALJ's citation to PT Winegardner's degree of reliance on less-than-credible subjective complaints and the inconsistency of the opinion with the evidence of record provided sufficient reason for the ALJ to

reject the opinion. *See* Tr. 25-26; 20 C.F.R. § 404.1520c(b)(2) (noting supportability and consistency are most important factors). Accordingly, substantial evidence supports the ALJ's rejection of PT Winegardner's opinion.

Next, Plaintiff asserts that the ALJ erred by dismissing the opinion of treating physician Dr. Row as "highly inconsistent with the record overall" (Tr.26). The ALJ gave less credit to the opinion in part because Dr. Row "does not have orthopedic specialization" and in part because he "gave no supporting comments for his findings and instead cited his examination notes, which contrast his opinion as noted." (Tr. 26-27).

The ALJ stated that the contemporaneous physical examination from October 8, 2019, did not support Dr. Row's opinion. (Tr. 26) (citing Tr. 1036). For example, the examination indicated that Plaintiff had normal strength, sensation, and reflexes in his extremities, which would not support Dr. Row's significant manipulative restrictions (*see* Tr. 989, 1036). The ALJ found Dr. Row's exhortation that Plaintiff exercise to lose weight to be inconsistent with the opinion restricting him from more than "very little" standing and walking. (Tr. 26, 988). The ALJ also cited previous examinations, which she also found inconsistent with the opinion. Tr. 26; *see, e.g.*, Tr. 702-03 (normal examination except for mild abdominal tenderness), 915 (unremarkable examination except for calf muscle atrophy), 932 (unremarkable examination except for slight ankle swelling and right lower extremity tenderness). The ALJ also found the opinion to be inconsistent with the orthopedic and podiatry records. Tr. 26; *see* 20 C.F.R. § 404.1520c(c)(2). The ALJ found the relatively normal examination findings and Plaintiff's reports of pain in those notes not to be consistent with the degree of limitation Dr. Row assessed. Tr. 26 (citing Tr. 993-95, 1000). Finally, the ALJ noted Dr. Row's treatment relationship and lack of orthopedic

20

specialty. Tr. 26-27; *see* 20 C.F.R. § 404.1520c(c)(3), (4) (specialization).

As the Commissioner points out, contrary to Plaintiff's contention, the ALJ did not need to go into greater detail to explain why she found the opinion inconsistent with the evidence of record.  The Seventh Circuit "require[s] only that the ALJ minimally articulate h[er] reasoning." *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) (internal quotation marks omitted); *see Michael K. v. Saul*, No. 20 C 2944, 2021 WL 1546426, at *5 (N.D. Ill. Apr. 20, 2021) (noting principle in case governed by § 404.1520c). The ALJ's articulation need only "be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The ALJ sufficiently stated that she found the opinion to be inconsistent with the record evidence, and she cited the evidence to which she was referring—namely findings and reports contained in the notes of Dr. Row, the orthopedist, and the podiatrist (*see* Tr. 26).

The ALJ also properly cited the lack of orthopedic specialty on the part of Dr. Row. *See* Tr. 27; 20 C.F.R. § 404.1520c(c)(4). Given the significance of Plaintiff's spinal impairments and ankle fracture, it is certainly relevant, as a secondary consideration, that Dr. Row was not a specialist in orthopedics. *Se*e Tr. 18, 22-27; 20 C.F.R. § 404.1520c(b)(2), (c)(4) ("The medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than [that of a non-specialist].").

Also, the ALJ had no duty to re-contact Dr. Row. Contrary to Plaintiff's assertion, the ALJ was not uncertain about how the evidence Dr. Row cited could support his opinion—the ALJ simply, and properly, determined that the evidence of record did not support the opinion. (Tr. 26-27). In any event, "[a]n ALJ need recontact medical sources only when the evidence received

21

is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see* 20 C.F.R. § 404.1520b(b) (indicating that re-contacting treating source is one of multiple actions adjudicator may take when decision cannot be made due to insufficiency of record evidence). Here, the evidence was adequate to decide the question of disability. Accordingly, substantial evidence supports the ALJ's rejection of Dr. Row's opinion.

Plaintiff next objects to the ALJ's assessment of the statement of NP Barchus. Plaintiff contends that the ALJ did not see the opinion of NP Barchus that Plaintiff would be capable of only low-stress jobs and would frequently experience pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 938). Plaintiff argues that the ALJ did not provide any evaluation of whether such opinions were consistent with or supported by the record.

However, the ALJ properly declined to evaluate NP Barchus's assessment as a medical opinion. On July 11, 2019, NP Barchus completed a checkbox questionnaire on which he gave no specific functional limitations (Tr. 938-41) but indicated that Plaintiff's orthopedic issues may limit him (Tr. 937), that his symptoms would frequently interfere with attention and concentration to perform even simple tasks, and that he was only capable of "low stress jobs" (Tr. 938). The ALJ determined that NP Barchus did not give any opinion appropriate for evaluation. (Tr. 26).

Contrary to Plaintiff's contention, the ALJ did not have to evaluate NP Barchus's assertions that Plaintiff's symptoms would frequently interfere with attention and concentration to perform even simple tasks, and that he was only capable of "low stress jobs." The applicable regulations narrowly define "medical opinion" as "a statement from a medical source about what [a claimant] can still do despite [his] impairment(s) and whether [he] ha[s] one or more

22

impairment-related limitations or restrictions" in various basic work activities, such as standing, walking, lifting, carrying, performing postural activities, seeing, understanding, remembering, maintaining pace, and adapting to environmental conditions. 20 C.F.R. § 404.1513(a)(2). By contrast, "judgments about the nature and severity of [a claimant's] impairments" are excluded from the definition of "medical opinion" but included as "[o]ther medical evidence." *See id.* § 404.1513(a)(2), (3). Moreover, statements regarding issues reserved to the Commissioner, such as whether a claimant can work, are considered "neither valuable nor persuasive" and do not need to be discussed. 20 C.F.R. § 404.1520b(c), (c)(3); *see Nicholas M. v. Saul*, Case No. 19-2224, 2021 WL 753558, at *3 (C.D. Ill. Jan. 19, 2021).

Here, the opinions Plaintiff asserts that the ALJ should have considered do not relate to Plaintiff's ability to perform specific basic work activities, but rather reflect judgments about the nature and severity of his impairments and his ability to work generally. Thus, the ALJ did not have to evaluate them as they are not "medical opinions". The ALJ reasonably found Plaintiff capable of performing unskilled, simple, routine tasks and maintaining concentration for two-hour periods. Thus, there is no basis for remand on this issue.

Next, Plaintiff argues that the ALJ failed to appropriately account for Plaintiff's moderate limitations in concentration, persistence, and pace (CPP) in both the RFC and the Step Five hypothetical questions to the VE. The ALJ provided mental limitations in the RFC to "perform work that can be learned in 30 days, or less, with simple routine tasks. He is able to remain on task in two-hour increments." (Tr. 22). The RFC describes the most a claimant can do despite his limitations. 20 C.F.R. § 404.1545; Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996). It is the ALJ's prerogative to formulate the RFC based on the medical and non-medical

evidence as a whole. *See* 20 C.F.R. §§ 404.1545(a)(1), (3), 404.1546(c); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The ALJ is tasked with weighing evidence, resolving conflicts in the record, and deciding issues of credibility, and the court will not substitute its own judgment as long as the ALJ's findings are supported by substantial evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Moreover, "[t]he ALJ [need] only . . . include limitations in [the] RFC determination that [are] supported by the medical evidence and that the ALJ [finds] to be credible." *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011) (citing *Simila v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009)).

Here, the ALJ found that Plaintiff, despite his moderate difficulties with CPP, could remain on task for two-hour increments while performing work that can be learned in 30 days or less and involving simple, routine tasks. (Tr. 22). Substantial evidence supports this finding. At the hearing, Plaintiff denied any recent mental health treatment, including medication use. (Tr. 53). Examinations throughout the record from multiple providers generally do not show any deficits of alertness, orientation, attention, or concentration. *See, e.g.*, Tr. 541, 557-58, 634, 787, 907, 915, 993-95, 1000, 1036, 1042. When he saw Dr. Predina, Plaintiff reported being able to complete self-care tasks, complete household chores, spend time watching television, read and understand a newspaper, count money, organize bills, pay bills on time, and balance a checking account. (Tr. 792). Additionally, Dr. Predina's observation was that Plaintiff "appeared" to have impairments in concentration and persistence (Tr. 792), and she merely opined that he would "likely have some problems" concentrating and persisting on job tasks (Tr. 794). Finally, the state agency psychological consultants found that Plaintiff could perform detailed tasks and that he could "attend to tasks for a sufficient period to complete tasks." (Tr. 87, 118).

24

Plaintiff cites no evidence that would compel a reasonable factfinder to conclude that Plaintiff could not sustain concentration for two-hour periods consistent with the RFC. In any event, Plaintiff has not even asserted what limitations he believes would have properly accounted for his moderate limitation, so any error here would be harmless. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (finding any error harmless because plaintiff did not assert any appropriate RFC restrictions to properly account for moderate limitations and medical records did not support any such restrictions). Therefore, remand is not warranted.

Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby AFFIRMED.

Entered: December 3, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court